# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL PODOLAK, as Personal
Representative of the Estate of Ilko Podolak,
deceased,

       Plaintiff-Appellant,

v

GREGORY AND LAURA PODOLAK,

       Defendant-Appellees,

and

PAUL PODOLAK,

       Defendant.

UNPUBLISHED
March 23, 2017

No. 330385
Wayne Probate Court
LC No. 14-799438-CZ

---

*In re* Estate of ILKO PODOLAK, deceased.

---

MICHAEL PODOLAK, Personal Representative,

       Appellant,

v

PAUL, GREGORY AND LAURA PODOLAK,

       Appellees.

No. 331127
Wayne Probate Court
LC No. 14-797335-DE

---

Before: TALBOT, C.J., and MURRAY and BOONSTRA, JJ.

PER CURIAM.

-1-

In these consolidated appeals[1] petitioner appeals by right the probate court's order denying his petition to return estate assets and granting respondents' motion for summary disposition.[2] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The decedent, Ilko Podolak (known as Alex), died intestate in February 2014 at the age of 84. His wife, Dolores Podolak (Delores), had died in 1999. Alex was survived by three sons: Paul Podolak (Paul), petitioner and personal representative Michael Podolak (Mike), and respondent Gregory Podolak (Greg).

In early 1996, Alex, a Vietnam veteran, underwent surgery following a military injury, and was left totally blind in his right eye and nearly blind in his left eye (reporting in 1996 that he could only view "large objects" from that eye). After the surgery, Alex applied for and received Veteran's Administration (VA) benefits and Social Security benefits. In May 1996, Alex and Dolores opened a joint bank account at Dearborn Federal Credit Union (DCFU). Greg was listed as the sole beneficiary on this account. The membership application for DCFU contained language indicating that the owners of this joint account, i.e. Alex and Dolores, agreed that the funds deposited into the account were owned by both of them jointly, with rights of survivorship. The Social Security benefits were deposited into a Comerica Bank account, while the VA benefits were deposited into the DCFU account. Greg testified at his deposition that he had an ATM card for the DCFU account, and that from 1996 to 2000 he would both deposit money into the account at his parents' direction and take money out of the account (including for his own use).

Dolores died in late 1999. Fourteen days later, in early 2000, Alex and Greg signed a document at DCFU that included a Joint Share Account Agreement; it informed joint account owners that all funds on deposit in a joint account are owned by any of the joint owners, and that the credit union could release or pay any amount on deposit in the account to any owner. The document reflects the handwritten notations "Removed 'Dolores' per cc death cert & added son as joint" and "prime is legally <u>blind</u>." The document did not list any beneficiaries.

The parties agree that from 2000 until Alex's death in 2014, Greg paid Alex's bills from the two accounts.[3] They differ, however, with respect to the propriety of Greg's use of funds in

---

[1] See *Estate of Podolak v Podolak; In re Estate of Podolak*, unpublished order of the Court of Appeals, issued January 20, 2016 (Docket Nos. 330385, 331127).

[2] The petitioner and personal representative filed both a civil case and an application for informal probate and petition to return estate assets; both cases ultimately were assigned to the same probate judge.

[3] No record evidence exists regarding whether Greg was a joint owner of the Comerica account, as the probate court found, or was merely a payee on that account, as Mike argues on appeal. At oral argument below, Mike's counsel stated that Mike would be willing to consider that all the funds from the Comerica Bank account were used to pay Alex's bills and confined his argument

-2-

excess of those needed to pay Alex's bills. Greg testified at his deposition that as early as 1996, when he was added as sole beneficiary to the DCFU account, it was his parents' wish that he receive all the funds in that account upon their deaths, and that Alex reaffirmed that by making him a joint account owner of the DCFU account in 2000. Greg further testified that he understood his father's wish to be that Mike and Paul would receive the family home and that he would receive the money remaining in the accounts. Greg stated that Alex was aware that Greg was taking money from the account for his own use and raised no objection. Greg stated that until 2013, Alex would sign his VA benefits check and Greg would either deposit the funds or cash the check. In the latter event, he would use some of the cash to pay Alex's bills, would give Alex between one and two hundred dollars in cash, and would keep the rest. After 2013, the VA benefits were direct-deposited monthly into the DCFU account.

Mike testified at his deposition that he lived with Alex and Dolores (until her death), and then with Alex, from 1998 until Alex's death. Mike stated that his wife Carol (whom he married in 2008) moved into the home in 2008 with her daughter, age 10 at the time of his deposition. Mike further testified that Paul moved into the home in 2010. Mike testified that he paid rent of $100 a month while Dolores was alive, but did not pay rent afterward. Mike stated that Alex "wasn't that bad at first" and had "limited vision" for the first three or four years. He stated that he principally assisted Alex with cooking, cleaning up, and cutting the lawn during this time period. Mike stated that Greg was paying the bills from Alex's account, and would buy groceries for the house, although Carol would have to supplement the groceries with food purchased with their own money throughout the month. Mike testified that Alex's vision, as well as his hearing, began to worsen near the end of his life, specifically the last 4 years, and that he then required more care and supervision. In fact, Carol quit her job in January 2014 because Alex needed her assistance around the home. However, Mike testified that Alex had a "very good memory" and was never diagnosed with any mental deficiencies, dementia, or Alzheimer's disease. Mike testified that Alex told his sons that "when he dies the money gets split up evenly three ways" and that "everyone [would] be well taken care of, the three of us." Mike stated that he did not become aware, until after Alex's death, that Greg was taking money from the DCFU account for his own use.

After Alex's death and Mike's appointment as personal representative of Alex's estate, Mike filed suit, alleging embezzlement or conversion, breach of fiduciary duties, undue influence, and fraudulent concealment with respect to Greg's use of funds in the DCFU and Comerica accounts. Specifically, the complaint alleged that between 2000 and 2014, respondents[4] improperly spent or retained for themselves over $400,000 of Alex's Social Security and VA benefits, and that in doing so Greg exerted undue influence on Alex and breached his fiduciary duties to Alex. Mike also filed a petition and motion in the probate court for the return of estate assets and the appointment of a receiver.

to the funds in the DCFU account. On appeal, Mike also makes no specific argument related to the Comerica Bank account. We therefore confine our review to the DCFU account.

[4] Laura was alleged to have either been "directly involved" or "knowingly participated" in Greg's withdrawal of the funds from the accounts at issue and in spending those funds for their personal benefit.

-3-

The cases were consolidated as described above. Respondents moved for summary disposition pursuant to MCR 2.116(C)(8) and (10) and subsequently moved the probate court to dismiss Mike's petition and motion. Respondents argued that Mike had failed to present any proof of undue influence, coercion, or fraud so as to invalidate Alex's agreement to joint ownership of the accounts at issue, and that Mike's claim was barred by both the joint account agreement signed by Alex and Greg and the statutory presumption found in MCL 487.703. At the motion hearing, Mike's counsel confined his argument to the DCFU account as described above.

Following the hearing, the probate court issued an opinion and order granting respondents' motion pursuant to MCR 2.116(C)(10) and dismissing Mike's complaint. The probate court held that Mike had presented no evidence that Alex was unduly influenced, coerced, or misled into entering a joint account agreement with Greg, and rejected Mike's argument that the joint account was a mere "account of convenience" or was created by fraud. Further, the probate court held that the unrebutted presumption of joint ownership found in MCL 487.703 indicated that Alex had intended that Greg have use of and access to the joint account as a matter of law, and further noted Alex's lack of mental deficiencies or disease at the time of his death, as well as the fact that Alex did not have a durable power of attorney (DPOA) and had never had a conservator or guardian appointed on his behalf. The probate court also denied Mike's petition and motion for return of estate assets, and dismissed Mike's complaint.

These appeals followed.

## II. STANDARD OF REVIEW

We review de novo the probate court's decision on respondents' motion for summary disposition. *Moser v Detroit*, 284 Mich App 536, 538; 772 NW2d 823 (2009). Summary disposition is proper under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). We consider the affidavits, pleadings, depositions, admissions, and other documentary evidence in the light most favorable to the nonmoving party. *Liparoto Constr, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 29; 772 NW2d 801 (2009). All reasonable inferences are to be drawn in favor of the nonmovant, *Dextrom v Wexford County*, 287 Mich App 406, 415; 789 NW2d 211 (2010).

We review de novo the probate court's interpretation of statutory language. *Slatterly v Malidol*, 257 Mich App 242, 250-251; 668 NW2d 154 (2003).

## III. JOINT ACCOUNT

Mike argues that the trial court erred by failing to at least hold that a question of material fact existed regarding whether the DCFU account was an account of convenience rather than a true joint account, whether Greg breached his fiduciary duty to Alex, and whether Greg unduly influenced Alex. All of Mike's arguments essentially boil down to whether he presented

sufficient evidence to overcome the statutory presumption found in MCL 487.703. We hold that he did not.

MCL 487.703 governs joint accounts and provides in relevant part:

When a deposit shall be made, in any bank by any person in the name of such depositor or any other person, and in form to be paid to either or the survivor of them, such deposits thereupon and any additions thereto, made by either of such persons, upon the making thereof, shall become the property of such persons as joint tenants, and the same together with all interest thereon, *shall be held for the exclusive use of the persons so named and may be paid to either during the lifetime of both or the survivor after the death of 1 of them . . . .*

\* \* \*

The making of the deposit in such form shall, *in the absence of fraud or undue influence*, be prima facie evidence, in any action or proceeding, to which either such banking institution or surviving depositor or depositors is a party, of the intention of such depositors to vest title to such deposit and the additions thereto in such survivor or survivors. [Emphases added.]

To overcome the presumption of survivorship, a claimant must provide "reasonably clear and persuasive proof" of fraud or undue influence. See *Lau v Lau*, 304 Mich 218, 224; 7 NW2d 278 (1943).

Further, MCL 490.56 provides that a credit union account held by 2 or more persons, whether jointly or otherwise, "which does not expressly provide that there is no right of survivorship," is presumed to be a survivorship account; "sums on deposit in a survivorship account belong to the surviving party or parties as against the estate of the decedent." Finally, MCL 490.58 provides that the presumption found in MCL 490.56 is "based upon inferences of the intention of parties to multiple-party accounts arising from the form of the account and the usual expectations of people using these accounts" and is "rebuttable by clear and convincing evidence of a different intention."

In sum, Mike was required to provide the court with clear and convincing evidence that Alex, at the time he entered into to the joint account agreement with Greg, did not intend for Greg to have joint ownership of the funds to be deposited in the account, or provide at least reasonably clear and persuasive proof of fraud or undue influence. We conclude that Mike has not carried his burden.

With respect to evidence that Alex intended the account as an account of convenience to allow Greg to pay his bills, rather than a joint account, Mike can only point to statements from his own deposition indicating that Alex, at some unspecified time, had stated that he wanted his money split three ways and that everyone would be "well taken care of" when he passed away. This does not rise to the standard of clear and convincing evidence required to rebut the presumption found in MCL 490.58, especially in light of the fact that for 3 years before the creation of the joint account, Greg had been listed as the sole beneficiary on the DCFU account

and had an ATM card for the account, which supports the inference that Alex intended that Greg ultimately have the use and ownership of the funds in the account. See *Kirilloff v Glinisty*, 375 Mich 586, 590; 134 NW2d 707 (1965) (holding that the inference that there was no error in the trial court's holding that the evidence that the decedent was aware of the consequences of opening a joint account supported the inference that she meant the defendants to have title to the funds in the account, notwithstanding testimony that the decedent had stated she wanted her money divided amongst her children).

Additionally, Mike has presented no evidence that Greg exerted undue influence on Alex in early 2000 when the joint account was opened. When making a claim for undue influence, a claimant is required to show

> that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will. Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, are not sufficient. [*In re Estate of Karmey*, 468 Mich 68, 75; 658 NW2d 796 (2003), quoting *Kar v Hogan*, 399 Mich 529, 537; 257 NW2d 77 (1976).]

While the ultimate burden of proof remains with the claimant, a presumption of undue influence arises if the claimant introduces evidence that would establish "(1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary, or an interest represented by the fiduciary, benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction." *Kar*, 399 Mich at 537. If such a presumption arises, it falls to the person denying undue influence to present some evidence in rebuttal in order to survive summary disposition. See *id*. at 542.

Here, the probate court found that Mike had not presented sufficient evidence of a confidential or fiduciary relationship between Greg and Alex at the time Greg was added to the joint account. We agree. Although it appears that Greg did assume responsibility for payment of Alex's bills, there was no evidence presented that Alex and Greg had an *existing* fiduciary relationship at the time he was added to the joint account as a joint owner. And while a confidential relationship may exist when "a person enfeebled by poor health relies on another to conduct banking or other financial transactions," see *In re Swantek Estate*, 172 Mich App 509, 514; 432 NW2d 307 (1988), citing *Van't Hof v Jemison*, 291 Mich 385, 393-394; 289 NW2d 186 (1939), here there was no evidence presented that Alex, despite problems with his vision, was so enfeebled or in such poor health that he needed to rely on Greg to conduct his banking or financial affairs. In fact, Mike testified at his deposition that Alex did not need much help in the first 4 years after his surgery and began to get worse after 2003 or 2004, years after joint ownership of the DCFU account was established. Mike also testified that Alex had directed Greg to pay the taxes and other bills for the house. Further, Mike stated that in 2002 Alex had insisted that Greg reimburse Mike for the new hot water tank he had purchased for the house. Further, Mike also stated that, until nearly the end of his life, Alex went on his own to at least two different banks and conducted transactions there, and that he walked by himself to the gas station to purchase items and to return bottles. In sum, while Alex may have sought Greg's assistance in paying his household bills, the record does not support the inference that Greg was

in a fiduciary or confidential relationship with Alex at the time he was added to the DCFU account so as to trigger the presumption of undue influence. *Kar*, 399 Mich at 537. Without that presumption, Mike has failed to present "reasonably clear and persuasive" evidence that Greg unduly influenced Alex into adding him as a joint owner of the DCFU account, *Lau*, 304 Mich at 224; in fact, he stated that Alex was in possession of sound mental faculties until the end of his life and was never diagnosed with any mental deficiencies, Alzheimer's Disease, or dementia; nor did he ever have a guardian, conservator, or DPOA. Additionally, the lack of evidence of a fiduciary relationship defeats Mike's claim for the breach of duties arising from such a relationship.

As for fraud, we agree with the probate court that Mike did not plead fraudulent concealment with particularity. See MCR 2.112(B). Further, while Mike pleaded that respondents fraudulently concealed their use of Alex's bank account, he has not pleaded that Greg was added to the joint account as a result of fraud or misrepresentation. Finally, everyone who was deposed in this matter testified to their awareness that Greg was paying Alex's bills, and Mike testified to his awareness that Greg was paying the bills from Alex's account. Mike therefore did not present reasonably clear and persuasive evidence of fraud so as to defeat the presumption of joint ownership and survivorship of the funds in the DCFU account. *Lau*, 304 Mich at 224.

Finally, the VA medical records provided to the probate court by Mike do not refute our conclusions. While it does appear that in 1998 a VA employee requested that a Field Examiner explore whether Alex could manage his own funds, no such examination was ever performed. Further, while the VA records describe Alex as having been treated for depression and anxiety as well as "nervousness," they also describe him as "alert and oriented" and contain no diagnosis that suggests that Alex was cognitively impaired or unable to understand the consequences of opening a joint account. And the handwritten notes of a social worker that were made before 2000, to the extent they reference manipulation by family members, refer not to Greg but to Paul and Mike. The VA records do not aid Mike's arguments.

### III. CHECKS NOT DEPOSITED INTO A JOINT ACCOUNT

Mike also argues that, at a minimum, there is a question of fact concerning whether Greg converted the funds from Alex's VA benefit checks that he cashed but never deposited into the DCFU account. We disagree. No evidence was presented that Alex had directed Greg to deposit the entirety of the checks into the DCFU account. Greg testified that Alex was aware that he would sometimes cash the benefits check and place some funds into his own account or keep them as cash. Further, although no copies of the checks that were alleged to have been merely cashed rather than deposited into the DCFU account are found in the lower court record, Mike argues on appeal that Alex merely signed his name on the checks, and that this endorsement did not have the effect of endorsing the checks to Greg. In making this argument, Mike cites to MCL 440.3204(1), which governs the definitions of "endorsement" and "endorser" but does not in any event support Mike's argument that a simple signature indicates an endorsement only for the purposes of deposit. And Mike's argument is flatly contradicted by MCL 440.3205 (2), which provides that an endorsement that consists only of a signature is a "blank endorsement." Such an endorsement renders the instrument "payable to bearer and may be negotiated by transfer of possession alone" absent further endorsement. *Id*. In other words, once Alex signed

the checks and gave them to Greg, they were endorsed as payable to Greg. Mike presented no evidence that Alex was induced to sign the checks by fraud or misrepresentation, bad faith, or other challenges to the validity of the endorsement. Mike's argument concerning VA benefits checks cashed but not deposited by Greg therefore fails.

Affirmed. As the prevailing party, respondents may tax costs. MCR 7.219(A).


/s/ Michael J. Talbot
/s/ Christopher M. Murray
/s/ Mark T. Boonstra